ELIZABETH JOHNSTON, GEORGE W. JOHNSTON, AND JOHN LOGAN, AS ADMINISTRATOR OF THE ESTATE OF JOHN JOHNSTON, DECEASED, *Appellants*, v. ROBERT E. THOMAS AND P. E. BRADDOCK, *Appellees*.

## Division A.

## Opinion Filed January 19, 1927.

1. An executor *de son tort* is a person who without authority intermeddles with the estate of a deceased and does such acts as properly belong to the office of administrator, and thereby becomes a sort of *quasi* executor, although only for the purpose of being sued or made liable for the assets with which he has intermeddled.

2. The designation of executor *de son tort* is inapt in so far as it applies the term "executor" to intestate as well as testate estates, and gives to a person who had merely incurred certain liabilities by reason of his intermeddling an official title corresponding with that of a duly appointed representative. The abolition of the fiction of the office by statute does not, however, relieve the wrongdoer from liability for his unauthorized intermeddling. Section 3750, Revised General Statutes of 1920.

3. Intermedding may consist in collecting or taking possession of the assets, selling the property of the estate, paying out money of the estate in settlement of debts or otherwise, or any acts which are of the character which usually evinces a legal control.

4. An executor *de son tort* is subject to all the liabilities of of an ordinary executor or administrator without being entitled to any of his privileges, and he cannot obtain any personal *advantage* from his intermeddling.

5. The true representative is bound by those acts of an executor *de son tort* which are lawful and such as the true representative would have been bound to perform in the due course

of administration, but not by any other acts of such inter-
meddler.

6. Such intermeddler will not be allowed any credit for debts
which he has discharged which were not legal claims against
the estate; nor is the executor *de son tort* entitled to any
set-off by reason of the application of assets to his own
claim against the decedent.

7. The general rule is that the lawful executor or administrator
is the proper person to enforce liability against an executor
*de son tort;* especially so long as there are unpaid debts of the
decedent outstanding. Section 3750, Revised General Statutes.

8. Where fiduciary or confidential relations exist between two
parties, if the confidence of one in the other was abused so
as to obtain an unfair advantage of the confiding party,
the party so availing himself of such position will not be
permitted to retain the fruits of such unfair exercise of his
advantage, although the transaction could not have been
impeached if such confidential relation had not existed.

9. Where such a relation of confidence exists as will enable
the person in whom the confidence or trust is imposed to
exert influence over the person trusting him, while equity
will not deny the possibility of valid transactions between
the parties, yet where the transaction enables the superior
party to obtain a benefit, equity raises a presumption against
the validity thereof and casts upon such party the burden
of proving his compliance with equitable requisites, one of
which is that he shall have made a full and fair disclosure
of those pertinent and material facts regarding the transac-
tion resting in the breast of him who seeks to establish the
validity of the contract or transaction as against the personal
representative of the person so trusting him.

10. But where the confiding party has died and the party who
had enjoyed such confidential and fiduciary relations with
him attempts to establish the validity of a transaction with
such deceased by which he was the gainer, in a suit between
him and the personal representative of such deceased, he is
not, under our statute (Section 2705, Revised General

Statutes), a competent witness to testify 'to any communications between himself and the deceased regarding such transaction. Death having closed the lips of the one, the law closes the lips of the other. He must establish the *bona fides* of the transaction, if he can, by evidence other than his own testimony as to communications between himself and such deceased.

11. Evidence examined and Chancellor's finding as to *bona fides* of sale and conveyance by the deceased to his confidential friend sustained, there being in the record sufficient competent evidence upon which to base such conclusion, and the same not being clearly shown to be erroneous.

12. The death of the drawer of a check operates as a revocation of the authority of the bank to pay such check, and the payee who receives from a bank after the drawer's death the proceeds of a check drawn by him during his lifetime is as a general rule liable to account to the personal representative of the deceased for the funds thus collected, the amount due by the bank to the deceased at the time of his death being assets of the estate of such deceased.

13. A check of itself does not operate as an assignment of any of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder unless and until it accepts or certifies the check. Section 4842, Revised General Statutes.

14. Upon the determination of the genuineness *vel non* of a signature, this Court, in passing upon the finding of the Chancellor thereon, may consider the demonstrative evidence, consisting of comparison of the disputed signature with genuine ones in evidence and certified to this Court, as well as the testimony of witnesses with regard thereto.

An Appeal from the Circuit Court for Polk County; John S. Edwards, Judge.

*R. B. Huffaker* and *Lennard O. Boynton,* for Appellants;

*L. C. Johnson,* for Appellees.

STATEMENT.

BROWN, J.—The complainants, Elizabeth Johnston, widow of John Johnston, George W. Johnston, son of the deceased, and John Logan, as Administrator of the estate of John Johnston, filed their bill in the Court below against Robert E. Thomas and wife, E. K. Anderson and wife, and Louise Degavre and husband, and P. E. Braddock, praying the cancellation of a certain deed from John Johnston and wife to Robert E. Thomas, conveying certain property in Auburndale, Florida, and a deed from Robert E. Thomas and wife to E. K. Anderson, conveying the same property, and notes and mortgage from Anderson and wife to Thomas, and an assignment of said notes and mortgage to Louise Degavre; also for an accounting of the rents and profits on the property conveyed, on which there was a bearing orange grove; and, in the event complainants should not be found entitled to cancellation of the said deeds, notes and mortgages, that the Court render a decree of accounting against the defendants Robert E. Thomas and P. E. Braddock for the sale price of said grove, the sum of $12,000.00, and for general relief. After the filing of the bill, complainants, being the appellants here, abandoned the demand for cancellation of the deeds and mortgage and procured a dismissal of the bill as to the defendants Anderson and wife and Louise Degavre and husband, and thereafter sought to obtain a decree of accounting only as against the defendants Robert E. Thomas and P. E. Braddock, for the value of the assets of the estate of John Johnston, deceased, that came into their hands immediately before and after the death of the said John Johnston.

The bill alleged that the said John Johnston died at Coronet, Florida, on March 24, 1920, leaving surviving as his only heirs-in-law said Elizabeth Johnston, his widow,

and George W. Johnston, his son, and that John Logan was appointed *ex officio* administrator of the estate of the deceased by the County Judge of Polk County on June 27, 1921, and that since such appointment the widow had filed in the office of the County Judge her election to take a child's part in said estate. That shortly prior to his death the deceased was seized and possessed of a certain orange grove in Auburndale of the value of $12,000.00, and certain personal property consisting of cash on deposit in the Latin-American Bank of Tampa and the State Bank of Auburndale, approximately $1,500.00, two shares of the capital stock of said State Bank of Auburndale, of the value of $300.00, and certain Liberty bonds of the value of $1,000.00, and other personal property and effects of unknown description and value, but through the fraud, chicanery, imposition, undue influence and other inequitable conduct of the said Robert E. Thomas and P. E. Braddock, practiced toward and upon the said Johnston during his last illness, the said Johnston was shortly before his death wrongfully deprived of the ownership and possession of all of his said property.

That the defendant Robert E. Thomas obtained from the deceased what purported to be a warranty deed from said John Johnston and Elizabeth Johnston, conveying said grove property, dated August 13, 1919, and purporting to have been acknowledged by Elizabeth Johnston on September 11, 1919, and by John Johnston on February 13, 1920, but alleging on information and belief that said deed was not signed by John Johnston until March 23, 1920, the day before his death, and was filed for record the same day; that this deed was without consideration and that the defendant Robert E. Thomas, joined by his wife, attempted by warranty deed to convey said property to E. K. Anderson for a consideration of $12,000.00, of which $7,000.00 had

been paid in cash and the balance secured by five notes of $1,000.00 each, payable annually, and secured by first mortgage, which notes and mortgage the defendant Robert E. Thomas has subsequently assigned to Louise Degavre.

The bill further alleges that for several years preceding the death of said John Johnston, he and the defendant Thomas had been thrown together a great deal, were both members of the same secret order and that said Thomas had insinuated himself into the fullest confidence of the deceased and obtained a complete mastery over his mind and affections. That said Thomas was a shrewd real estate dealer, and that the deceased had given him the exclusive right as a real estate agent to sell said grove, and that Thomas had negotiated a sale of the grove for Johnston and the purchase by Johnston of a tract of land at Terra Ceia, Florida. That on or about January 1st, 1920, Johnston, became ill and left Auburndale and went to the home of his friend John Henderson at Coronet, Florida, and remained there until he died on March 24, 1920. That the defendant Thomas made frequent trips from Auburndale to Coronet, a distance of twenty-five miles, to visit Johnston during his illness, Braddock accompanying him on two occasions, having frequent secret conferences with the deceased, and secured from him during his last days the aforementioned deed to the grove property, and the possession of all of his personal property, including checks and orders signed in blank on all of Johnston's funds in banks, as well as for the Liberty bonds, and the signature of the deceased to an assignment of his stock certificate in the State Bank of Auburndale, which certificate Braddock caused to be cancelled and reissued to himself without consideration.

That after the death of the said John Johnston, the defendant Thomas pretended that the deceased had left all of his property in Thomas' care and that after reimbursing

and repaying himself a large loan he fraudulently pretended had been made by him to said Johnston and settling all debts against the estate, he was to pay and distribute the balance of the estate, which he claimed was about $1,700.00, to the relatives and certain friends of said Johnston. That said Thomas pretended to administer on the estate of said Johnston, but this he did as an administrator *de son tort*. That Thomas had refused to make any accounting except a false and fraudulent one, and that Thomas and Braddock had conspired to defraud the estate and the complainants by corruptly appropriating to their use the whole of the estate except such small portion thereof as was used to pay the cost and expenses of the last illness and burial of the deceased.

The defendant Robert E. Thomas, by separate answer, alleged that he had known the deceased for a great many years and had enjoyed a close and intimate acquaintance and friendship with him up to the time of his death. That for many years he had lived alone and was never visited by either of the complainants, his wife, Elizabeth Johnston, living in Scotland, or his son, George, residing in California. That during the later years of his life the deceased had accumulated certain property described in the bill, and that the defendant became the owner of the real estate by purchase from Johnston, his title dating from the delivery of a warranty deed duly signed and acknowledged by both the said John Johnston and his wife, the same being executed and acknowledged by John Johnston on February 13, 1920, in the State Bank of Auburndale, before said P. E. Braddock as a notary public and two witnesses. That said Johnston, during the year 1919, had bargained with the defendant Thomas for the sale of said grove property, and referred the abstract to Wilson and Swearingen, attorneys, for examination, who reported the

necessity of a suit to quiet title; that Johnston employed said firm to file such suit so as to be able to deliver a marketable title to the defendant; that the defendant did not a day of two before the death of said Johnston wrongfully deprive the said Johnston of his property but that the deed was signed and delivered on February 13, 1920, for a valuable consideration, the sum of $10,000.00.  That the defendant had never sought to defraud or deceive the deceased or to secure his property, but had always befriended him and helped him financially many times.  That while the deceased was at the home of John Henderson at Coronet, the defendant visited him on several occasions; that during none of these visits did the mind of said Johnston appear to be clouded or feeble, and he believed that his illness was not serious and that he would get well; that Johnston was a very taciturn man and would never converse about his personal affairs with the defendant when other people were present.  The defendant was never accompanied on any of his visits by Braddock but was accompanied by his brother and one or two other persons at different times.

That during 1917 and 1918 the defendant and Johnston were engaged together in prospecting certain lands for phosphate, upon an agreement to share the expenses thereof equally, and to have an equal interest in any phosphate-bearing lands which were acquired by them; that although they found no lands bearing phosphate in commercial quantities, the expenses of such operation were paid by the defendant Thomas and that Johnston had given him a note, bearing date April 8, 1918, in the sum of $6,500.00, for his half of such expenses.  That Johnston paid interest on this note in January, 1920, with certain Liberty bonds held by him at the State Bank of Auburndale, which bonds were credited on the note for interest when the same was turned over to Johnston later.  That on February 8, 1920,

Johnston borrowed from defendant $500.00 for the purpose of binding a trade for the land at Terra Ceia, and that the defendant had previously loaned him $300.00 in cash, agreeing to accept certain Liberty bonds amounting to $300.00 at par, which were in a Tampa bank. That on a visit to Johnston one or two days before he died, Johnston gave defendant checks as follows: on his checking account at State Bank of Auburndale, $384.59; on his savings account at the same bank, $192.43, closing both these accounts; and on the Latin-American Bank of Tampa, for $703.69, this latter check having been signed in blank as to amount because the amount of interest, and hence the amount of the account, was not known at the time, the same being a savings account; also deceased gave Thomas a written order for $300.00 in Liberty bonds which Thomas had paid for on January 29th, previously. That these checks were given to him by Johnston in consideration of Thomas' kindness to him and his care and affection for him when his own people would have nothing to do with him, and the defendant accepted them in the spirit in which they were given.

That about a week before he died, Johnston appointed defendant as his executor by paper-writing in words and figures as follows:

"Cornette Fla
"March 17th 1920

"Robert E. Thomas
   "Auburndale Fla.

In the event of my death this is to give you full power to handle the rest of the money that is cumming to me from grove which I sold you at Auburndale Fla, the 'balance dew me being thirty-four hundred and sixty dollars ($3460.00) out of this amount first you shall pay all of my debts and funeral expenses if there is sufficient left pay as

follows to my wife Mrs. E. Johnston twenty-five dollars ($25.00) to my daughter (Tiny) Miss E. Williamson three-fourths of the amount left, and the remainder to my son George Johnston.  Address of wife and daughter the Cottage 7 Navy Lane Lerwick Shetland Scotland.  Included in expenses mentioned herein I want Mr. John Henderson and girls living with him to be paid five hundred dollars ($500.00) for their trouble and kindness in taking care of me this closing my estate.

"JOHN JOHNSTON      (Seal)

"Witness:

"FRED L. THOMAS."

That relying on this paper-writing, the defendant had out of proceeds of the estate of the decedent disbursed $1,728.70 in payment for medical services, funeral expenses, attorney's fees, etc., due by the deceased, and other items, all of which were listed in said answer.  These items included $500.00 paid by Thomas to himself to cover the amount of the advance made by him for Johnston at the time of the contract for the purchase of the Terra Ceia property, also $150.00 paid by him to John Henderson and his daughters for their services to the deceased during his last illness.  To this list were added two items: "balance due John Henderson, $350.00, and balance due Snively, $228.00.  It subsequently appeared in the testimony that the defendant Thomas thought that these two amounts should be paid, the first in order to carry out the expressed wish of the deceased, and the second to pay a valid debt to Snively for fertilizer.  After adding these two items to the list, the defendant's answer claims that the balance due by him to the estate of John Johnston amounted to $1,153.25.

The defendant admitted that he and the said Johnston were both members of the same Masonic lodge at Auburndale, but claimed that he had never, by reason of said rela-

tion, attempted to deceive or mislead the deceased, but that all of his dealings with him had been honest and honorable and in keeping with the teachings of said order. That defendant stands ready to carry out the wishes of the deceased according to the paper-writing aforesaid, or as the court may direct.

P. E. Braddock filed a separate answer in which he denied all the charges of misconduct against him, or that he had profited in any way by the disposition of the grove property, but alleged that he had purchased from the said Johnston two shares of stock in the State Bank of Auburndale for the sum of $250.00 and that the deceased had assigned the same to him in January, 1920, and that the defendant paid him therefor. He also denied that he ever visited the deceased at Coronet in company with Thomas, or confederated with him in any way. He admitted taking the acknowledgment of Johnston to the deed above described on February 13, 1921, and that he and his wife had signed the same as witnesses.

The complainants contend that the defendant Thomas should be charged with the following items covering assets of the estate of John Johnston which came into the hands of Thomas as executor *de son tort*:

From sale of the John Johnston orange grove...$12,000.00
Savings account in State Bank of Auburndale..        192.43
Checking account in State Bank of Auburndale..        384.59
Savings account in Latin-American Bank, your
. city ....................................        703.69
U. S. Liberty Bonds in Latin-American Bank,
your city ..............................        300.00

Total ................................$13,580.71

Complainants admit that defendant Thomas should be credited with the following items paid out by him, being

a portion of the items contained in the list set forth in the defendant's answer above referred to, to-wit:

| | |
|---|---:|
| Dr. Crump, medical services | $ 105.00 |
| Dr. Byrd, medical services | 220.00 |
| Dr. Williams, medical services | 11.50 |
| Funeral expenses | 202.50 |
| Wilson & Swearingen, legal services | 250.00 |
| Wilson & Swearingen, legal services | 100.25 |
| Hull Jewelry Co., Plant City | 15.00 |
| City taxes, Auburndale (M. S. Jones) | 27.50 |
| Bob Campbell | 22.50 |
| Fred Thomas, moving man from Auburndale to Terra Ceia to work grove | 25.00 |
| ———— Cheshire, work on grove | 99.50 |

Total ...............................$1,078.75

Complainants deny that the defendant Thomas is entitled to credit for the amount of the note alleged to have been given by John Johnston, to said Thomas in 1918, $6,500.00, and $40.00 for interest, which the defendant Thomas claims was surrendered by him to Johnston and accepted by Johnston as part payment for said grove. Complainants also deny that said Thomas is entitled to credit for the following items contained in the list set forth in defendant's answer as having been paid out by him for the estate, to-wit:

| | |
|---|---:|
| R. E. Thomas advanced for Johnston on Terra Ceia property | $ 500.00 |
| Paid to John Henderson on amount left to him and girls in will | 150.00 |

$650.00

Complainants also deny that defendant Thomas is entitled to credit for funds held by him for the purpose of paying the following two items :

Balance due John Henderson and girls..........$ 350.00
Balance due John Snively......................  228.00

                                               $578.00

Thus the complainants deny that defendant Thomas is entitled to credit for items claimed by him totaling $7,768.00.

Thus it appears that the complainants claim that the defendant Thomas should account to the estate for the total purchase price of the grove sold by him to Anderson, $12,000.00, and the amount of the three bank accounts, $1,280.71, and the value of the Liberty bonds in the Latin-American Bank, $300.00, a total of $13,580.71. Defendant Thomas claims that he is only due to account to the estate for the balance due by him on the purchase price of the grove as sold to him by Johnston, $10,000.00, less the amount of the note with interest, $6,540.00, leaving a balance on that matter of $3,460.00, from which should be deducted the amounts paid out by him, including the items admitted by the complainants as proper, and also including the $500.00 paid to himself to reimburse him for the amount advanced by him for Johnston on the Terra Ceia property and the amount paid by him to John Henderson and his daughters for their services to the deceased, $150.00, a total of $1,728.75, leaving a balance due by him to the estate $1,731.25, from which he should be allowed to pay the balance due John Henderson and his daughters as provided in the unprobated will, $350.00, and the balance due John Snively for fertilizer, $228.00, accounting to the estate for the remainder, $1,153.25.

The Chancellor found in favor of the contentions of the

80    SUPREME COURT OF FLORIDA.

E. Johnson et al. v. R. E. Thomas and P. E. Braddock—Opinion of Court.

defendant Robert E. Thomas, on all the matters in dispute and rendered a final decree ascertaining that Robert E. Thomas had in his possession the sum of $1,731.25 belonging to the estate of John Johnston, deceased, and that the defendant P. E. Braddock should account to the estate for the sale of the two shares of capital stock in the State Bank of Auburndale, of the value of $200.00, and adjudged that the complainants recover of the defendant Thomas the said sum of $1,731.25, together with interest at 8% from March 24, 1920, to the date of the decree, making a total sum of $2,299.67, and that the complainants also recover of the defendant one-fourth of the costs of this suit, the said amount found due to be paid to John Logan, Administrator. A recovery was also adjudged in favor of the complainants against the defendant Braddock in the sum of $200.00 and interest, total $268.44, and one-half of the costs of this suit; to be paid to the administrator as aforesaid.

BROWN, J., after stating the facts as above:

The only statutory reference we have as to executors *de son tort* is found in Section 3750 of the Revised General Statutes, which reads as follows: ''No executor *de son tort*.—No person shall be liable as executor *de son tort* to recover from him a debt by a deceased person, but any person taking, converting or intermeddling with the property of a deceased person shall be liable to the executor, administrator or curator when appointed for the value of all the property so taken or converted, and for all damages to the estate of the deceased caused by his wrongful action; but this section shall not be construed so as to prevent a creditor of a deceased person from suing one in possession of property fraudulently conveyed by such deceased person, for the purpose of setting aside such fraudulent conveyance.''

The foregoing section appears to be confirmatory of the common law on this subject so far as it goes. We find no former decision of this court construing said section. In Sec. 2903, page 1211, of 24th C. J., it is said: "An executor *de son tort* is a person who without authority intermeddles with the estate of a deceased and does such acts as properly belong to the office of an administrator, and thereby becomes a sort of quasi executor, although only for the purpose of being sued or made liable for the assets with which he has intermeddled. The designation is inapt in that it applies the term 'executor' to intestate as well as testate estates, and also in that it gives to a person who has merely incurred a certain liability by reason of his intermeddling an official title corresponding with that of a duly appointed representative, and in many States the so-called office of executor *de son tort* has been abolished by statute, or is considered inconsistent with the prevalent system of administration. The abolition of the fiction of the office does not, however, relieve the wrongdoer from liability for his unauthorized intermeddling, but affects only the right to enforce such liability." See also 11 R. C. L. 456-7.

· Intermeddling may consist in collecting or taking possession of the assets, selling the property of the estate, paying out money of the estate in settlement of debts or otherwise, or any acts which are of the character which usually evince a legal control. 24 C. J. 1212. But it is said in the same section that intermeddling with real estate will not constitute a person an executor *de son tort*. See also 11 R. C. L., 457.

An executor *de son tort* is subject to all the liabilities of an ordinary executor or administrator without being entitled to any of his privileges, but although he cannot obtain any personal advantage from his intermeddling, he

can use proper means to protect the assets of the estate. 24 C. J. 1216, and 11 R. C. L. 461, citing a number of cases.

The true representative is bound by those acts of an executor *de son tort* which are lawful and such as the true representative would be bound to perform in the due course of administration, but not by any other acts of the intermeddler. 24 C. J. 1219, 1221. The intermeddler will not be allowed any credit for debts which he has discharged which were not legal claims against the estate; nor is the executor *de son tort* entitled to any set-off by reason of the application of assets to his own claim against the decedent. 24 C. J. 1221, citing California, Kentucky, Maryland, Massachusetts, New Hampshire, North Carolina, Virginia, and English cases; 11 R. C. L. 463.

As to who may enforce liability against an executor *de son tort,* the general rule is that the lawful executor or administrator is the proper person. At common law an executor *de son tort* could be sued by creditors of the decedent, and it is held by some authorities that the legatees or next of kin may enforce such liability, although the more generally accepted view is that they have no such right, at least, while there are unpaid debts of the decedent. 24 C. J. 1217; 11 R. C. L. 461-2. The effect of our statute, Sec. 3750, Revised General Statutes, appears to be in line with the weight of authority to the effect that the proper party to require an accounting by any person intermeddling with the property of a deceased person is the executor, administrator, or curator, when appointed.

It, therefore, appears that the widow and son were not necessary parties complainant as to those features of the bill praying an accounting as against the defendant Robert E. Thomas, though the bill as originally filed praying for cancellation of the deed of the decedent to said Thomas made them proper parties as to that matter. This appears

to have been recognized in a way by the Chancellor, who decreed that the amounts found to be due to the estate be paid to the administrator, who was one of the parties complainant.

As to the matters in dispute, we will first consider the question as to whether or not the defendant Thomas should be charged with all or any part of the proceeds of the sale of Johnston's grove place as being assets of the estate. The Chancellor manifestly took the view that the sale by the decedent to Thomas was a legitimate transaction concluded during the life time of the decedent and that Thomas was only chargeable with the balance due on the purchase price of $10,000.00 after deducting the amount of Johnston's note to him, which, with interest, amounted to $6,540.00, and that Thomas' sale of the property to Anderson for $12,000.00 was his own affair and that he was not accountable to the estate for any part of the purchase price or for the profit of $2,000.00 which he made on the transaction. While the testimony of Thomas as to his transactions with the deceased was introduced in evidence before the special master over the objection of the complainants and reported to the Chancellor along with the other testimony, we will assume that the Chancellor did not consider this testimony of Thomas, which was plainly incompetent under Section 2705 of the Revised General Statutes.

The witness John Dampier, who had been a friend of Johnston for a good many years, testified that Johnston, during his last illness, told him that he had sold his place in Auburndale to Anderson for $12,000.00. Also that defendant Thomas, on one of his visits to Mr. Henderson's to see Mr. Johnston, during his illness, told him that he had sold said place "for Uncle Jack," and witness was quite sure that he named the same price, but did not state to whom he had sold it. Witness John Henderson, a long-

time friend of the decedent, and at whose home he passed away, testified that Thomas told him during Mr. Johnston's last illness that he had sold the latter's grove at Auburndale for him and was not charging him anything for making the sale; that either Thomas or Johnston told him that the price was $12,000.00.

He also testified that Johnston told him during his last illness that he wanted to sell Auburndale property and get another place down in Terra Ceia Island, and that he had located a place belonging to a man named Blood and there was $500.00 up on it. He also said that Johnston told him previously, in the latter part of 1919, that he was trying to sell his Auburndale place. The witness Burnett testified that after the funeral he had a talk with Thomas and that Thomas told him that he had sold the grove for Johnston to Mr. Anderson, but that he was not getting anything for it at all, that he was just making the sale on account of friendly feelings. Attorney B. C. Wilson testified that he drew the deed in 1919 for Mr. Johnston, which was finally used in the transfer of the property to Thomas, and mailed it to Johnston at Auburndale, and that it was returned to his office after it came back from Scotland, where it had been sent during 1919 for execution by Mrs. Johnston, and that he turned it over to Thomas upon a written order signed by Johnston, dated January 29, 1920; that the name of the grantee in the deed was left in blank and witness did not know who the purchaser was to be. There was introduced in evidence a letter by the defendant Thomas to George W. Johnston, son of the deceased, dated March 26, 1920, two days after Johnston's death, in which, among other things, it is said: "George, your father deeded me all the property he had, so I could settle up all his debts, when I get things all settled I will have some money for you, so you keep on riting me so I will no where you are. When I

git it I also am going to send Tena and your mother some money, two.'' Another letter in evidence written by Thomas to the same party, reads as follows: ''You ask me to make a statement in regards to how your Father left things. He deeded his place to me and the other little stuff and ask me to sell it and pay all his and expenses and if I had enough left after this was done to send two hundred fifty dollars, and to give your sister one thousand Dollars and your Mother twenty-five Dollars, and if there were any left it was mine for my trouble.

''So I have sold the place George but I had to sell it on installment plans and it will be about July 20th before I will have any money for you, but I think I will have enough to pay you all the full amount he wanted you to have.''

He also wrote a similar letter to Christina Williamson, Shetland, Scotland, a daughter of Johnston's wife by a former marriage, for whom it appears the decedent had entertained considerable affection.

On the other hand, witness for the defendant, Fussell, who visited Johnston with Thomas several times during his last illness, testified that during one of these visits Mr. Johnston had told him that he was selling his home place in Auburndale to Mr. Thomas, that it was too large for him and he was going to Terra Ceia and buy a place there, that he was selling his Auburndale place to Thomas for $10,000.00. In connection with the drawing of the deed and perfecting of the title, Attorney Wilson testified that he was under the impression that Johnston stated to him that he was perfecting the title to the property for the purpose of selling same to Mr. Thomas. Witness Nunn testified that about the middle of February, about a month before Mr. Johnston's death, the latter and defendant Thomas asked him to figure the amount of interest due on the note given by Johnston to Thomas, that he figured the

86      SUPREME COURT OF FLORIDA.

E. Johnson et al. v. R. E. Thomas and P. E. Braddock—Opinion of Court.

interest up to that date, and that the note was closed out as payment by Thomas to Mr. Johnston on the grove, Thomas to pay the difference. That prior to that time, about January 1, 1920, he had figured the interest on this same note and that it amounted to about $720.00, which he understood was paid to Thomas by Johnston with some Liberty bonds, and that they had the Liberty bonds with them at Thomas' office. That at the time he figured the interest the second time, about the middle of February, he also had the deed to the grove property and he supposed the note was delivered at that time, but he could not testify positively. That he had frequently performed similar services for Johnston, and that some time before this matter was closed Mr. Johnston had told him that he and Mr. Thomas were figuring on the sale, and that they had agreed that he would sell the property to Thomas for $10,000.00. Defendant Braddock and his wife testified that on February 13th Braddock took the acknowledgment of Mr. Johnston to the deed, and they both signed as witnesses, and the deed was handed back to Mr. Johnston. This was done at the bank to which Thomas and Johnston came together. That the name of Robert E. Thomas appeared in the deed as the grantee, and after its execution the deed was handed back to Mr. Johnston. Braddock said he could not be positive but that he thought Mr. Johnston then delivered the deed to Thomas. Witness E. A. Stevenson testified that he had known Mr. Johnston for several years and that they had had frequent conversations in the park at Auburndale and on one accosion after Christmas and before Johnston's death, Johnston told him that he had sold his grove property to Mr. Thomas, and that he wanted his daughter to have something out of it; that he owed Mr. Thomas quite an amount and he wanted Mr. Thomas to have what was left. In answer to the question, ''Did he say or give you any idea

of how much he would have left when settlement was made?'' the witness answered, ''Well, he said he wouldn't have no big amount; that was just the remark he made to me.'' Witness Fred Thomas, a brother of Robert E. Thomas, testified that he went down to Coronet with his brother several times to call on Mr. Johnston during his last illness, and that Mr. Johnston requested his brother to draw up the paper-writing, purporting to be a will, which is quoted hereinabove as a part of the defendant's answer, and which Fred Thomas signed as a witness. He testified that this document was written by his brother and Mr. Johnston told him what he wanted him to write, and that after it was written, Mr. Johnston signed it and at his request the witness signed it. It will be recalled that this document contains an acknowledgment that the balance due by Thomas to Johnston on the grove was $3,460.00. Witness said that this writing was prepared and signed just a few days before Mr. Johnston's death, and it bears date of March 17, 1920, just one week prior to the date of his death. Complainants question the genuineness of the signature of John Johnston to this document, but upon consideration of the testimony and a careful comparison of the signature with the various admittedly genuine signatures of Mr. Johnston on several of the exhibits certified to this court, we are satisfied the Chancellor correctly concluded that the signature is genuine.

There was, therefore, competent testimony before the Chancellor upon which to base his conclusion that the decedent had sold and conveyed the place to Thomas for $10,000.00, crediting on the purchase price $6,540.00 due by Johnston to Thomas by note, which was closed out as part payment. While there is abundant evidence in the testimony that there was a genuine attachment between these two men, Johnston and Thomas, and that they had been

very close and devoted friends for several years, and reposed absolute confidence in each other, and that Johnston sought the advice of Thomas about his business affairs; that Thomas had shown great kindness and consideration for this lonely and rather taciturn old man whose wife had remained in Scotland and lived separate and apart from him for over thirty years, and whose son had seen very little of his father,—there is no foundation in the testimony for any reasonable doubt of the mental soundness of Johnston up to practically the very last. The testimony indicates that his mental faculties were unimpaired. He might have been, and no doubt was, strongly influenced by any advice that Thomas might have seen fit to give him on account of his absolute confidence in him, but his mind was apparently his own and perfectly sound until practically the very end.

He and his wife had long been more or less estranged and separated; his son has seen very little of him for some years, though he did visit him during his last illness. Mr. Johnston evidently received much comfort from and placed great store upon the friendship and companionship of Thomas. Under such circumstances, it was not unnatural that he should want Thomas to receive something from his estate. There is no law prohibiting a man from making gifts to his friend, or from trading with his friend on favorable or even generous terms, provided such friend makes full disclosures of all pertinent facts and takes no unfair advantage of the trust and confidence reposed in him.

There can be little doubt that a difuciary or confidential relation existed between Thomas and the decedent, and that if this confidence was abused or this influence flowing therefrom so exerted as to obtain an unfair advantage of the confiding party, the person so availing himself of such

position would not be permitted to retain the fruits of such unfair exercise of such advantage, although the transaction could not have been impeached if such confidential relation had not existed. See Dale v. Jennings, 107 So. 175, and authorities cited in the opinion by Mr. Justice TERRELL. Where such a relation of confidence exists as will enable the person in whom the confidence or trust is reposed to exert influence over the person trusting him, while equity will not deny the possibility of valid transactions between the parties, yet where the transaction between them enables the superior party to obtain a benefit, equity raises a presumption against the validity and casts upon that party the burden of proving his compliance with equitable requisites and thereby overcoming the presumption. One of those requisites is that there shall have been the fullest and fairest explanation and communication of every material fact resting in the breast of the one who seeks to establish a contract with a person so trusting him. See 2nd Pomeroy's Eq. Juris., 4th Ed., Secs. 902, 955, 956. Yet where the confiding party has departed this life, we have the somewhat anomalous situation that the burden is placed upon the confidential friend who dealt with the deceased to show that he made full and fair communication of all the material facts to the deceased, and yet he is not a competent witness to testify to any such communications himself in any suit between him and the executor or administrator of the estate of such deceased party. This rule may sometimes work a hardship on an honest party who happens to have no other evidence but his own by which to prove his communications with the deceased, or otherwise show the entire *bona fides* of the transaction. But death having closed the lips of one, the law closes the lips of the other. Sec. 2705, Revised General Statutes. The law on this subject is evidently based

upon the same philosophy which animated the Scottish
bard when he wrote:

"I'll no say mankind are villains a';
    The real, hardened, wicked,
Who know nae check save human law
    Are to the few restricket;

But, och, mankind are unco weak,
    Not always to be trusted—
When self the wavering balance shakes
    'Tis seldom right adjusted."

Under these principles, it was undoubtedly the duty of
Thomas to disclose to Mr. Johnston the fact that he,
Thomas, could sell the property to Anderson for $12,000.00.
It will be recalled that he made a trade with Anderson to
sell him this grove property on January 24, 1920, for
$12,000.00, while he did not close the trade with Mr. John-
ston by taking a deed to the property until February 13th,
1920 (though there is evidence indicating that the trade
with Johnston dated back several months.)   So at the time
he closed the trade with Johnston by which he, Thomas,
secured the property for $10,000.00, he had already ar-
ranged to sell the property to Anderson for a profit of
$2,000.00.   On this point, it appears from the testimony of
several of the witnesses introduced by the complainants
themselves that Johnston must have known that Anderson
would pay $12,000.00 for the property.   Their testimony
was to the effect that Johnston told them that he, Johnston,
had sold the property to Anderson for $12,000.00.   There
was, therefore, evidence  from which the court below could
reach the conclusion that at the time Mr. Johnston executed
the deed naming Thomas as grantee, which had been signed
by his wife several months previously with the name of the

grantee left in blank, to Mr. Thomas, he knew that the property could be sold, or that Thomas would sell the property, to Anderson for $12,000.00.   The testimony of Thomas in regard to this transaction cannot be considered.   What Mr. Johnston's motive was in deeding the property to Thomas for $10,000.00 when he knew that Anderson would buy for $12,000.00 is not expressly disclosed by the competent testimony in the case.   He may have desired Mr. Thomas to have the benefit of this profit on account of his past services and friendship.   On the other hand, it is possible that he may have considered Thomas a mere conduit through whom the trade with Anderson should be consummated and conveyed the property with the idea that whatever profit was derived should be considered assets of his estate, though this is quite strongly rebutted by the so-called will, reciting the balance due by Thomas.   There is another motive which might have prompted him, suggested by Thomas' letter to Mr. Johnson's son and step-daughter, wherein Thomas stated that Mr. Johnston had deeded him all his property and put everything in his name so that he, Thomas, could settle up all his debts.   It may be that Mr. Johnston, realizing that his illness might result fatally, preferred to convey the property directly to Thomas, allowing him to take credit for the note and make any profit that might finally be derived from the sale to Anderson if consummated, and use the balance in settling up his debts, rather than await the final consummation of the sale to Anderson.   Anderson had paid $100.00 to Thomas at the time of his trade on January 24th, and on January 29th, he paid him $900.00 more, and there was an agreement between them that the next payment should come out of the fruit crop on the place, so on April 24th, Anderson paid Thomas $4,415.72, adding enough to make a total payment of $6,000.00, when a new contract was made for the payment of the balance.

Anderson testified that at the time of the trade on January 24th he understood that Thomas had the sale of the property, or owned it, he did not know which. So, it appears that at the time Mr. Johnston conveyed the property to Thomas, and at the time he signed the paper-writing in the nature of a will, which, by the way, was never attempted to be probated, only $1,000.00 had been paid by Anderson as a binder on the trade with Thomas. Whatever may have been his motive, there was a substantial evidence to sustain the chancellor's conclusion that Mr. Johnston conveyed the property to defendant Thomas with knowledge of what Anderson was willing to pay for the property, and the paper-writing signed by him just a few days before his death showed that he did not expect any further payment from Thomas on the grove beyond the balance of $3,460.00, which was left after the application of the amount of the note on the purchase price of $10,000.00 testified to by witnesses Nunn and Stevenson, and the credibility and disinterestedness of whose testimony the record discloses no reasonable ground to question. While the question above discussed is not without difficulty, we cannot say from the consideration of all the competent testimony that the Chancellor erred in his conclusion on the facts in regard thereto.

It appears, however, that the defendant Thomas is chargeable, and should be held to account to the complainant administrator for most of the remainder of the disputed items. It appears from the testimony of the witness Fussell that all the checks closing out the three bank accounts were delivered by Mr. Johnston to Mr. Thomas at Coronet on the afternoon of March 23rd, the day before Johnston's death. He died during the night, in the early morning of March 24th. The two checks on the State Bank of Auburndale, one to close out the checking account and

the other the savings account, are stamped paid March 24th, and the check on the Latin-American Bank for $703.69 is stamped paid March 25th. Fussell was a witness introduced by the defendant. If his testimony is correct, it is hardly possible that these checks were paid before Mr. Johnston's death. All three checks are dated March 22nd, but the body of the checks was evidently written by some person other than Johnston or Thomas. The pass book of Mr. Johnston with the Auburndale State Bank shows that the savings account was closed out on March 22nd by the withdrawal of $193.43 but the check was stamped paid March 24th, and the ledger shows that the checking account was closed by the check of $384.59 on March 24th, and Thomas in his testimony stated that this check was delivered to him the day before Mr. Johnston's death. The order for the Liberty bonds was dated March 15th, and was type-written, but according to Fussell's testimony it was not delivered to Thomas until the afternoon before Mr. Johnston's death when the checks were delivered. The testimony for the defendant Thomas does not make it at all clear or certain that these three checks, or any of them, were paid, or the $300.00 of Liberty bonds, were delivered before Johnston's death. In fact, the tendency of the evidence is to show that such payment of checks and delivery of bonds did not take place until after his death. It follows that such bank balances and bonds were still assets of the estate of John Johnston at the time of his death and that the Court below should have required defendant Thomas to account for them to the lawful administrator of the estate subsequently appointed.

"As a general rule, the death of the drawer of a check operates as a revocation of the authority of the bank to pay, and the bank is liable if it pays after notice of such death; but a bank incurs no liability by the mere fact of paying

a check after the drawer's death, where at the time of such payment it did not know the fact. It has been considered that, even though the circumstances are such that a bank has incurred no liabliity by paying a check after the drawee's death, the payee who has received the proceeds after the drawer's death must refund the amount to the drawer's estate." 7 C. J. 702-704, and cases cited. Section 4842 of Revised General Statutes, being one of the sections relating to nogotiable instruments, provides: "A check of itself does not operate as an assignment of any of the funds to the credit of the drawer with the bank; and the bank is not liable to the holder, unless and until it accepts or certifies the check."

This makes it unnecessary for us to consider the much mooted question in this case as to whether the signatures to these three checks and the order for the bonds were genuine signatures of the deceased.

As to the question whether the purported signature of John Johnston to the assignment of the two shares of stock in the State Bank of Auburndale to Defendant Braddock, was or was not genuine, upon a careful consideration of all the testimony on this point, as well as of the admittedly genuine signatures of Mr. Johnston which were introduced in evidence and certified to this Court, we are not able to say that the Chancellor erred in his conclusion that such signature was not the genuine signature of Mr. Johnston, and we find no reason to disturb his finding on that point. Boyd v. Gossar, —, Fla. —, 82 So. 758, 6 A. L. R. 500.

In view of the substantial services rendered by Mr. Henderson and his daughters to the deceased during his last illness, we would not be authorized to disturb the ruling of the Chancellor that defendant Thomas should be allowed credit for the $150.00 paid to them .

Under the law as hereinabove set forth, we conclude that

the Court below was in error in allowing defendant Thomas credit for the $500.00 paid to himself out of the funds of the estate coming into his hands to reimburse him for the amount which the evidence tends to show he had advanced to the deceased during his lifetime as part payment on the purchase of the Terra Ceia property. As we have already seen, an executor *de son tort* cannot pay to himself any debt due him by the deceased, no matter how just and valid it may be, and must account for any sum so paid to the lawful administrator subsequently appointed. For payment of his debt he must look to the lawful administrator just the same as any other unpaid creditor of the estate.

To sum up, we have reached the conclusion that in addition to the sum of $1,731.25, with interest thereon from March 24, 1920, which the Court below decreed should be paid by defendant Thomas to the complainant administrator, there should have been added a sum sufficient to cover the following:

| | |
|---|---:|
| Amount paid by Thomas to himself to cover sum claimed to have been advanced by him for Johnston on Terra Ceia property .................$ | 500.00 |
| Balance of savings account in State Bank of Auburndale ................................. | 192.43 |
| Balance of checking account in State Bank of Auburndale ............................ | 384.59 |
| Balance of Savings account in Latin-American Bank ................................... | 703.69 |
| Value of U. S. Liberty bonds delivered to Thomas by Latin-American Bank, par value $300.00, market value indicated by evidence $300.00.. | 300.00 |
| Total ...............................:........$2,080.71 | |

To these additional items should be added interest from the date of Johnston's death. In other words, the decree

of the Court below should have required the defendant Thomas to account to the complainant administrator for the total sum of $3,811,96, together with interest thereon at 8% from March 24, 1920, to the date of the decree.

Reversed and remanded with instructions to the lower Court to amend its final decree so as to accord with the conclusions set forth in this opinion.

Reversed and remanded with instructions.

ELLIS, C. J., AND STRUM, J., concur.

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., concur in the opinion.